# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | CRIMINAL NO. 07-30182-WDS |
| RANDALL G. BAKER, | ) | |
| Defendant. | ) | |

## MEMORANDUM & ORDER

**STIEHL, District Judge:**

This matter is before the Court on defendant's motion to suppress (Doc. 33) to which the government has filed a response (Doc. 41). The Court held an evidentiary hearing on the motion and took the matter under advice pending the filing of post hearing briefs by the parties. They have now filed their briefs (Docs. 53 and 54).

## BACKGROUND

The defendant was arrested on October 4, 2007, at the Pilot Truck Stop in Troy, Illinois, after cocaine was recovered from a semi-tractor trailer in which Baker was the co-driver. He asserts that he was arrested without probable cause and, therefore, any statements he made after his arrest should be suppressed.

At the hearing, the government presented the testimony of Sergeant Greg Hosp, Caseyville Police Department, who is assigned to the Drug Enforcement Agency Task Force in Fairview Heights. Sgt. Hosp testified that he has been an officer with Caseyville Police Department for ten years and is second in command after the Chief of Police. He has been assigned to the DEA Task Force for approximately two years, and is on a Hotel/Motel Initiative and a Commercial Motor Vehicle Interdiction Unit. In addition, his duties involve assisting in

surveillance operations, interviewing witnesses and other duties. He stated that he was involved in truck interdiction on October 4, 2007, in Troy, Illinois, at approximately 8:00 a.m. and observed a truck in which the defendant was located. He noted that the Department of Transportation number was a high number, indicating a newer company. In light of the fact that gas prices are higher and newer companies have a harder time getting started, there is a greater likelihood that newer companies may be involved in narcotics trafficking. They approached the passenger's side of the semi which was occupied by a Mr. Tilden Crase and asked to speak to him. He was cooperative and agreed to talk to them. He said that they had a produce load in the truck, divided into four separate loads. The loads originated from Hidalgo, Mission, and Brownsville, Texas. Sgt. Hosp noted that these places are close to the Texas/Mexico border which is where narcotics enter the country. Sgt. Hosp asked Crase for the bills of lading for the loads, and he was able to only produce one bill of lading. He did not hand it over, but held it out at a slight distance. In light of the fact that there were supposedly four loads on the truck, Sgt. Hosp stated that there should have been four bills of lading.

Sgt. Hosp asked Crase where the loads were going, and Crase was only able to answer "East," without specific destinations. Crase was, by this time, acting nervous, and glanced back towards the sleeper area of the truck. At that time, Task Force Officer Eric Buck advised Sgt. Hosp that there was a padlock on the back of the truck, which is not unusual, but that the seal that was there had been broken, which is unusual. Usually the seal number is placed on the bill of lading once the load is placed on the truck. That way the receiver can check the bill of lading and the seal to insure that the load has not been tampered with.

Because Crase kept looking back to the sleeper area, Sgt. Hosp asked if there was anyone there. Crase identified his co-driver was there. At that point, Sgt. Hosp asked if they could

search the truck, and Crase reached into a pocketed area above his head and removed a set of keys. He said, "Sure," and got out, and walked them to the back of the truck. Crase fumbled with the keys and was unable to unlock the padlock, and said that he believed his co-driver had the keys. This was another incongruity because in the trucking industry, a co-driver is there to keep the truck moving. If the truck is stopped, it is not making any money, and both drivers are responsible for the load. They returned to the cab of the truck and Crase woke up the defendant. Baker stuck his head out of the sleeper portion of the cab and Sgt. Hosp stated that it was obvious that he had not been sleeping. Crase handed Baker a set of keys, Baker put on a shirt and came out of the cab and took the large key ring Crase had given him, walked to the back of the trailer, and opened the trailer.

The trailer had several bean totes, large Tupperware-type of totes, which were in the back with duct tape around the outside of them. There were no other loads of produce or anything in the trailer. TFO Buck entered the back of the trailer, opened the totes and said that there was illegal narcotics in the totes. At that point, TFO Buck made a signal by putting his hands together, indicating that the defendant should be secured. Sgt. Hosp then went into the trailer and cut open one of the bags which contained a white powdery substance, which he believed was cocaine. At that point, the defendant was placed into handcuffs and taken under arrest. Baker was given his *Miranda* warnings and admitted his involvement in the transporting of narcotics.

Sgt. Hosp did not ask Crase for his identity, nor for the registration on the truck before arresting the defendant, Baker. At some point during these proceedings, Crase fled from the area on foot and escaped at that time. Crase has been indicted in this case along with defendant Miguel Mariscal, Jr. The defendants are charged by the grand jury in a two count indictment. Count 1 charges all defendants with conspiracy to knowingly and intentionally distribute and

possess with intent to distribute marijuana and cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A)(ii) and § 846.  Count 2 charges all defendants with possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

## DISCUSSION

The defendant asserts that he is not contesting the lawfulness of the search, and, for purposes of the motion to suppress, that Crase consented to the search of his truck. He asserts, however, that his arrest was without probable cause, and without a warrant. The defendant further claims that because Sgt. Hosp did not know who owned the trailer, did not know the relationship between Baker and Crase, other than that Crase had identified Baker as his "co-driver," and that Crase presented the keys to Baker to open the trailer.  The defendant asserts that without a warrant, the arrest of Baker was without probable cause in these circumstances.

### 1. Probable Cause to Arrest the Defendant

"Probable cause is a commonsense, nontechnical conception that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *United States v. Hobbs,* 503 F.3d 353, 359 (7th Cir. 2007), (quoting *Ornelas v. United States,* 517 U.S. 690, 695 (1996));*Illinois v. Gates,* 462 U.S. 213, 231(1983).

The defendant asserts that the officers did not have enough information, at the time of his arrest, to amount to probable cause particularized to the defendant. The Supreme Court held in *Ybarra v. Illinois,* 444 U.S. 85, 91 (1979) that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." (Citing *Sibron v. New York,* 392 U.S. 40, 62-63 (1968)).

In this case, the Court **FINDS** that the officers had probable cause to arrest Baker.  Baker was in the cab of the trailer in which the drugs were located at the time that the officers started

questioning Crase; he had been identified by Crase as the "co-driver" of that tractor-trailer; and, importantly, Baker was able to easily locate the correct key to open the trailer padlock. Once the drugs were located in the back of the trailer, the officers had more than sufficient probable cause to arrest Baker. All of these things are particularized to Baker, and gave the officers probable cause to believe that he was engaged in illegal narcotics trafficking.

### 2. Admission of the Defendant's Confession

The defendant also asserts that his confession should be suppressed because it was the fruit of the poisonous tree. In light of the Court's finding that the defendant's arrest was based on probable cause, the Court must reject this contention. To the extent that the defendant asserts that his confession was, in any manner, involuntary, the Court also rejects that assertion.

The Seventh Circuit has held that "[a] confession is voluntary if, in the totality of circumstances, it is the 'product of a rational intellect and free will and not the result of physical abuse, psychological intimidation, or deceptive interrogation tactics that have overcome the defendant's free will.'" *United States v. Huerta*, 239 F.3d 865, 871 (7th Cir. 2001) (*quoting United States v. Dillon*, 150 F.3d 754, 757 (7th Cir.1998)); *See also, United States v. Gillaum*, 372 F.3d 848, 856 (7th Cir. 2004). "[C]oercive police activity is a 'necessary predicate to the finding that a confession is not "voluntary" within the meaning of the Due Process Clause of the Fourteenth Amendment.'" *Huerta*, 239 F.3d at 871 (*quoting Colorado v. Connelly*, 479 U.S. 157, 167 (1986)). Factors relevant to a determination that police conduct is coercive include "the defendant's age, education, intelligence level, and mental state; the length of the defendant's detention; the nature of the interrogations; the inclusion of advice about constitutional rights; and the use of physical punishment, including deprivation of food or sleep." *Id.* Here, the defendant's assertions of involuntariness are based upon his belief that the arrest was invalid.

There is nothing in the record to show that the defendant's confession was based upon any coercion, or anything else which would render it involuntary.

## **CONCLUSION**

Accordingly, the Court **DENIES** defendant's motion to suppress on all grounds asserted.

**IT IS SO ORDERED.**

**DATED: June 11, 2008.**


        **s/ WILLIAM D. STIEHL**
          **DISTRICT JUDGE**